SO ORDERED: August 18, 2022.



_____
James M. Carr
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BWGS, LLC, | ) | Case No. 19-01487-JMC-7A |
| | ) | |
| Debtor. | ) | |
| | ) | |
| JOHN J. PETR, TRUSTEE FOR BWGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 21-50007 |
| | ) | |
| BMO HARRIS BANK, N.A., | ) | |
| SUN CAPITAL PARTNERS VI, L.P., | ) | |
| JOHN DOE CORPORATIONS 1 THROUGH | ) | |
| 10 and OTHER JOHN DOE ENTITIES 1 | ) | |
| THROUGH 10 all of whose names are unknown, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER DENYING BMO'S MOTION TO DISMISS

THIS ADVERSARY PROCEEDING comes before the Court on *Defendant BMO Harris N.A.'s 12(b)(6) Motion to Dismiss* filed by BMO Harris Bank N.A. ("BMO") on June 4, 2021 (Docket No. 53) ("BMO's Motion"). BMO's Motion seeks dismissal, as to BMO, of the

*Amended Complaint to Avoid and Recover Fraudulent Transfer* filed by John J. Petr, chapter 7 trustee ("Trustee"), on April 23, 2021 (Docket No. 40) (the "Complaint").

The Court, having reviewed the Complaint, BMO's Motion, the *Brief in Support of Defendant BMO Harris N.A.'s 12(b)(6) Motion to Dismiss* attached to BMO's Motion (Docket No. 53-1), *Plaintiff's Objection to Defendant BMO Harris Bank N.A.'s Motion to Dismiss* filed by Trustee on July 16, 2021 (Docket No. 58), *Plaintiff's Omnibus Brief in Opposition to Defendants' Motions to Dismiss* filed by Trustee on July 16, 2021 (Docket No. 56) (the "Response Brief"), the *Declaration of John J. Petr* filed on July 16, 2021 (Docket No. 57) ("Trustee's Declaration"), and the *Joint Reply Brief in Support of Defendants' BMO Harris N.A.'s and Sun Capital Partners VI, L.P.'s 12(b)(6) Motions to Dismiss* filed on July 30, 2021 (Docket No. 60) (the "Reply Brief"), and being otherwise duly advised, now **DENIES** the Motion.

*Positions of the Parties*

By the Complaint, Trustee seeks to avoid and recover from BMO a payment of $24,887,303 (the "Payment") made by BWGS, LLC ("Debtor") to BMO. Debtor made the Payment with respect to indebtedness owed to BMO by BWGS Intermediate Holding, LLC ("Holding"), Debtor's parent. Trustee asserts that the Payment was constructively fraudulent and that BMO is liable for the value of the Payment under §§ 544 and 550(a) of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"),[1] and Ind. Code § 32-18-2-17(a)(1) and -18(b)(1)(A).

---

[1]   Unless otherwise noted, all statutory references are to the Bankruptcy Code.

BMO argues that Trustee's claims are defeated by the "safe harbor" provision of § 546(e), asserting that Debtor made the Payment to a financial institution in connection with a securities contract. Trustee argues that the safe harbor does not apply.

*Factual Allegations*

Debtor was organized as an Indiana corporation named "Worm's Way, Inc." (Complaint, ¶ 33). By 2016, all of the stock in Debtor was held in an ESOP Trust[2] (Complaint, ¶ 42). Debtor's stock was never publicly traded (Trustee's Declaration, ¶ 3). By 2016, Sun Capital Partners VI, L.P. ("Sun Capital") became interested in acquiring Debtor (Complaint, ¶ 41).

During 2016, Sun Capital or its affiliate(s) and the ESOP Trustee negotiated a purchase by an affiliate of Sun Capital of Debtor's stock held by the ESOP Trust (Complaint, ¶ 43). The negotiations resulted in the SPA under which Holding, an acquisition vehicle formed and controlled by Sun Capital, acquired all of the issued and outstanding shares of capital stock of Debtor from the ESOP Trust (Complaint, ¶¶ 43, 44; Trustee's Declaration, Ex. A).

On or about December 30, 2016, the Acquisition closed (Complaint, ¶ 48). The funds needed to close the Acquisition totaled $56,335,542, of which $37,751,632 (the "Cash Due") was required to fund the payment to the ESOP Trust at closing (Complaint, ¶ 45). To provide a portion of the Cash Due, BMO agreed to make a Bridge Loan to Holding of $25.8 million pursuant to the Loan Authorization Agreement between BMO and Holding (Complaint, ¶ 47; Trustee's Declaration, Ex. B). In connection with closing the Acquisition, Holding executed and delivered to BMO the Bridge Loan Note, and BMO disbursed $25.8 million of loan proceeds to the ESOP Trust (Complaint, ¶ 48). Debtor was not a co-maker with Holding on the Bridge Loan Note, Debtor was not a party to the Loan Authorization Agreement, and Debtor did not

---

[2] Capitalized terms not defined herein have the meanings ascribed to such terms in the Complaint.

guarantee the indebtedness evidenced by the Bridge Loan Note (Complaint, ¶ 49). Debtor was not a party to the Acquisition or the closing thereof.

Upon the closing of the Acquisition, Debtor became a direct wholly-owned subsidiary of Holding (Complaint, ¶ 54). On January 19, 2017, Debtor was converted from an Indiana corporation to a Delaware limited liability company named "BWGS, LLC" (Complaint, ¶ 54).

Thereafter, Sun Capital caused Debtor to enter into two credit facilities to obtain funds to repay Holding's Bridge Loan (Complaint, ¶ 55): (1) a Term Loan of $20 million made by lenders to Debtor and Holding as co-borrowers (Complaint, ¶¶ 56, 57); and (2) a Revolving Line of Credit, ostensibly up to $20 million, extended by lenders to Debtor and Holding as co-borrowers (Complaint, ¶¶ 58, 59). On January 27, 2017, the Credit Agreements were closed (Complaint, ¶ 66), and $25,887,303 (the "Payoff Amount") was transferred to BMO in full payment of the Bridge Loan (Complaint, ¶¶ 66, 67). The Payoff Amount included the Payment ($24,887,303), which consisted of $19,477,597 in proceeds from the Term Loan, $5,000,000 in proceeds from the Revolving Line of Credit, and $409,706 from Debtor's cash on hand (Complaint, ¶¶ 68, 69, 70). The amount of the Payment is the "Transfer" that Trustee seeks to recover by the Complaint.

Debtor's financial position weakened after the Payment such that by December 31, 2017, Debtor was in violation of certain covenants in the Credit Agreements (Complaint, ¶¶ 98-112). Debtor continued to default under the Credit Agreements and, from time to time, obtained a default waiver from lenders (Complaint, ¶¶ 113-122). On March 13, 2019, an involuntary bankruptcy petition was filed against Debtor commencing the chapter 7 case (Bankruptcy Case Docket No. 1). On April 24, 2019, the *Order for Relief in an Involuntary Case and Order to Complete Filing* was entered (Bankruptcy Case Docket No. 13) (the "Order for Relief").

*Standard of Review*

> Courts review and resolve Rule 12(b)(6) motions as follows:
>
> A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint and not the merits of the suit. *See Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). In ruling on such a motion, the Court accepts as true all of the well-pleaded facts alleged by the plaintiff and all reasonable inferences that can be drawn therefrom. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555–56 (2007); *see also Tamayo v. Blagojevich,* 526 F.3d 1074, 1082 (7th Cir. 2008).
>
> To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint must first comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the ... claim is and the grounds upon which it rests." *Twombly,* 550 U.S. at 555 (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 677–78 (2009). Second, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 570); *see also Tamayo,* 526 F.3d at 1082. The Supreme Court explained that the "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (quotation marks and brackets omitted); *see also Iqbal,* 556 U.S. at 678–79; *Brooks v. Ross,* 578 F.3d 574, 581 (7th Cir. 2009). Determining whether a complaint states a plausible claim for relief requires the Court to draw on its judicial experience and common sense. *Iqbal,* 556 U.S. at 679.

*Trustees of Teamsters Union Local No. 142 Pension Trust Fund v. Cathie's Cartage, Inc.*, 2013 WL 2402990 at *3 (N.D. Ind. 2013).

*Decision*

The first question raised by BMO's Motion is whether the Complaint provides a short, plain statement of Trustee's claims, showing that Trustee is entitled to relief and giving BMO fair notice of Trustee's claims and the grounds therefor. The second question is whether Trustee has stated plausible claims upon which relief can be granted.

The answer to both questions is "yes". As required, the Court accepts as true all well-pleaded facts and reasonable inferences drawn therefrom. In so doing, the Court has relied on the allegations of the Complaint, the documents attached thereto and/or referenced therein and Trustee's Declaration.[3] The Court concludes that the Complaint contains sufficient factual allegations to pass muster under Rules 8 and 12(b)(6).

*Reasoning*

Under the "strong arm" powers of § 544, Trustee stands in the shoes of an unsecured creditor of Debtor in seeking to recover from BMO under the Indiana Uniform Voidable Transactions Act, Ind. Code §§ 32-18-2-1 through -23 (the "IUVTA"). Under IUVTA § 18(b)(1), Trustee may recover the "value" of the Transfer if the Transfer "is avoidable in an action by a creditor under section 17(a)(1)" of the IUVTA. IUVTA § 18(b)(1) allows for recovery of the amount of an avoidable transfer from the first transferee of the Transfer.

Pursuant to IUVTA §§ 14 and 15, the Transfer is avoidable under IUVTA § 17(a)(1) if (1) Debtor made the Transfer without receiving reasonably equivalent value in exchange for the Transfer; and (2) Debtor's financial condition met the tests of IUVTA §§ 14(a)(2) or 15(a)(2). Trustee has adequately pleaded in the Complaint that those elements of avoidability exist as to the Transfer and recovery from BMO.

Trustee also seeks to avoid the Transfer under § 544 and recover from BMO under § 550. Therefore, BMO's Motion turns on the proper interpretation of § 546(e), the "safe harbor". In relevant part, that section protects from avoidance transfers "made by or to (or for the benefit of) a … financial institution … in connection with a securities contract". BMO argues that the SPA

---

[3] *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice" (citations omitted)).

and certain other agreements are "securities contracts" and that the Transfer was made "in connection with" one or more of such contracts. The Court disagrees.

In 1975, the district court for the Southern District of New York issued its decision in *Seligson v. New York Produce Exchange*, 394 F.Supp. 125 (S.D.N.Y. 1975). *Seligson* opened the door to avoidance liability for intermediaries, such as commodities clearing associations, that facilitate trades in the commodities clearing and settlement system. Concerned that a "domino effect" from a large bankruptcy could destabilize securities markets, Congress enacted section 764(c), the predecessor of § 546(e), to protect margin payments to and deposits with commodities brokers from avoidance. Frederick L. White, *The Commodity-Related Provisions of the Bankruptcy Act of 1978*, 34 Rec. Ass'n. B. N.Y.C. 262, 269-71 (1979); *see* S. Rep. No. 95-989, at 106 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5892; *see also FTI Consulting, Inc. v. Merit Mgmt. Grp., LP*, 830 F.3d 690, 696 (7th Cir. 2016), *aff'd and remanded*, 138 S.Ct. 883 (2018) (Congress enacted the safe harbor in response to *Seligson*).

Four years after enacting section 764(c), Congress amended the Bankruptcy Code to protect financial intermediaries in the national clearance and settlement system with respect to trades of publicly-held securities (the "Securities Clearance and Settlement System" or "System"). Act of July 27, 1982, Pub. L. No. 97-222, 96 Stat. 235 (the "1982 Amendments"). These financial intermediaries help create "a system of independent guarantees" in connection with the purchase and sale of publicly-traded securities, guaranteeing to both sides the settlement of the trade. *Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655, 664 n.10 (N.D. Ill. 1991). To mitigate the risk that these guarantees will be called, clearing agencies require their members (so-called "participants") to post collateral and may require a participant to post additional collateral depending on the participant's degree of trading risk. *See* Neil M. Garfinkel, *No Way Out: Section 546(e) Is No Escape for the Public Shareholder of a Failed LBO*, 1991 Colum. Bus.

L. Rev. 51, 64-65 (1991). Thus, a financially challenged participant might be required to make additional deposits during its slide into bankruptcy. These transfers might be exposed to avoidance in bankruptcy absent the type of protection afforded by § 546(e).

The 1982 Amendments addressed congressional concern that avoidance of such transfers could ripple through and destabilize the System. As explained in the report of the House Judiciary Committee, "the amendments are intended to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." H.R. Rep. No. 97-420, at 1; *see also id.* (explaining the safe harbor provision is necessary "to prevent the insolvency of one commodity or security firm from spreading to other firms and possibl[y] threatening the collapse of the affected market").

Congress re-designated section 546(d) as § 546(e) in 1984,[4] and further amended the provision in December 2006 to clarify that the safe harbor applies to all transfers (other than actual fraudulent transfers) made to designated financial intermediaries in connection with their facilitation of trades executed through the Securities Clearance and Settlement System or the commodities clearance system.[5] As explained by the House Committee on Financial Services, the 2006 amendment operates to "reduce systemic risk in the financial markets by clarifying" the application of the safe harbor to transactions similar to those already covered by existing law. H.R. Rep. No. 109-648, at 1-2. "The common thread of these transactions [covered by the safe harbor] is that they involve financial intermediaries – stockbrokers, financial institutions, financial participants or securities clearing agencies – that often hedge their risk on these transactions through other market transactions, repledge securities collateral received under these transactions, or both." *Id.* at 5 and 8.

---

[4] Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333.

[5] Financial Netting Improvements Act of 2006, Pub. L. No. 109-390, 120 Stat. 2692.

Even with this clear legislative intent, courts have no clear mandate in the language of § 546(e) to apply the safe harbor to shield transfers that do not implicate the Securities Clearance and Settlement System. Courts should be particularly reluctant to do so where, as here, the transfer under attack does not implicate the national System for trades of publicly-held securities or pose a systemic risk to the financial marketplace.[6] Nonetheless, under such circumstances, no conflict exists between (1) enforcing the Bankruptcy Code's policy of maximizing the bankruptcy estate by protecting "the Trustee's well established and important avoidance powers"; and (2) the purpose § 546(e) was enacted to serve. *Geltzer v. Mooney (In re MacMenamin's Grill Ltd.)*, 450 B.R. 414, 423 (Bankr. S.D.N.Y. 2011).

Advocating a literal interpretation of the broadly defined terms of the safe harbor provision, BMO argues that the Court must apply § 546(e) to defeat Trustee's claims, even though the underlying purchase of stock was a private transaction that did not in any sense involve the System that § 546(e) was intended to protect. (Reply Brief, pp. 3-7.) While the words of a statute are a starting point for interpretation, a strictly literal interpretation (without any consideration of the statutory purpose) is disfavored when it "would frustrate the overall purpose of the statutory scheme, lead to absurd results, or contravene clearly expressed legislative intent." *United States v. Vallery*, 437 F.3d 626, 630 (7th Cir. 2006). *See also Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 377-78, 134 S.Ct. 1058, 1060 (2014) (in the context of 15 U.S.C. § 78bb(f)(1), interpretation of a statute's language must be consistent with the statute's basic focus, language and purpose).

---

[6] On the other end of the spectrum, the safe harbor should not be interpreted "so expansively that it covers any transaction involving securities that uses a financial institution or other named entity as a conduit for funds." *See Merit*, 830 F.3d at 695-97.

The Court must determine whether a sufficient nexus exists between the Transfer and a "securities contract" that would lead to the conclusion that the Transfer was made "in connection with" such a "securities contract".[7]  Neither party cites authority that interprets the phrase "in connection with" as used in § 546(e).  However, in *Chadbourne*, the Supreme Court of the United States ("SCOTUS") interpreted the meaning and requirements of that phrase ("in connection with") as used in the Securities Litigation Uniform Standards Act of 1998 (the "Litigation Act").  The Litigation Act forbids large securities class actions based upon State law if the claim includes misrepresentation or omission of a material fact "in connection with" the purchase or sale of securities traded on a national securities exchange (a "covered security").  SCOTUS had to decide whether there was a sufficient nexus between (1) securities sold by the defendants to the plaintiffs in private transactions that were not conducted on a national securities exchange (uncovered securities); and (2) securities traded on a national exchange (covered securities) that were promised to the buyers (but did not exist) to back up the seller's obligations with respect to the sale of non-public securities.  Justice Breyer, writing for the SCOTUS majority, said "in connection with" "suggests a connection that matters".  *Chadbourne*, 571 U.S. at 387, 134 S.Ct. at 1066.  He explained that in interpreting statutes using the phrase "in connection with", like the Litigation Act, courts have to consider the statutory scheme and purpose in which the statute and phrase are found.  Justice Breyer refused to give the phrase an

---

[7]     Based on the briefing, it is tempting to focus on the issue of whether a transaction that does not implicate the Securities Clearance and Settlement System for trades of publicly-held securities or pose a systemic risk to the financial marketplace can be protected by the safe harbor. (Response Brief, pp. 1-4, 10-20; Reply Brief pp. 1-11.) The parties have noted arguments and law on both sides of the issue of whether a transaction can be "disqualified" from safe harbor protection just because it does not implicate the Securities Clearance and Settlement System. However, this Court's focus is on the phrase "in connection with".  As such, this Court is not trying to override the clear language of § 546 but rather trying to determine whether such phrase should be stretched to "connect" a transfer of funds with a transaction that occurred nearly a month earlier when the face of the documents do not make such a material connection.  In this light, the Court does not think it wrong to consider the purposes of the statute when interpreting it.

overly broad construction because "to interpret the necessary statutory 'connection' more broadly than we do here would interfere with state efforts to provide remedies for victims of ordinary state-law frauds." *Id.* at 391, 134 S.Ct. at 1068.

Here, an overly expansive interpretation of "in connection with" would not advance any purpose underlying Congress' enactment of the safe harbor of § 546(e) or the policies underlying the avoidance provisions of the Bankruptcy Code's chapter 5 or the IUVTA. To stretch "in connection with" to find some nexus between a securities contract and the Transfer would not advance any appropriate statutory purpose, especially where no material nexus appears on the face of the securities contracts identified by BMO and the Transfer.

Nothing in the SPA (or any of the other agreements that BMO asserts constitutes a "securities contract") indicates that the contract was executed or performed "in connection with" the Transfer. Instead, two separate transactions were closed approximately one month apart. As to the first transaction (the purchase of the outstanding stock of Debtor by Holding from the ESOP Trust), the SPA is a securities contract, and the payment of $56,335,542, including the Cash Due, is a transfer in connection with that securities contract. Trustee is not seeking to avoid that transfer.

As to the second transaction (the transfer to BMO of the Payoff Amount, including the Transfer, to fully repay the Bridge Loan), the various loan documents, and the transactions completed pursuant to them, have nothing to do with the purchase or sale of any securities or any "securities contract". For BMO to prevail, the Transfer would have to have been made in connection with the SPA (or related contracts); it was not. There is not a sufficient material nexus between the SPA (or any related contract) and the Transfer to bring the "safe harbor" of § 546(e) into play. As such, the Transfer is not a transaction intended by Congress to be protected by the safe harbor.

*Conclusion*

For the reasons described above, the Court DENIES the Motion. A telephonic status conference is set for **September 12, 2022 at 10:00 a.m. EDT** To participate, parties should call (888) 273-3658, passcode 6349352.

IT IS SO ORDERED.

# # #